IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DELILAH MARTSOLF, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 13-1581 |
| | ) | |
| v. | ) | |
| | ) | United States Magistrate Judge |
| UNITED AIRLINES, INC., | ) | Cynthia Reed Eddy |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Cynthia Reed Eddy, United States Magistrate Judge

## I.    Introduction

Plaintiff Delilah Martsolf initiated this action against Defendant United Airlines, Inc. ("United"), asserting violations of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et. seq.* ("ADA").  Martsolf alleges to be an individual having a disability within the meaning of the ADA; that is, significant hearing loss that affects her ability to speak.  She claims that while working at United, she was subjected to a hostile work environment and was discharged because of her alleged difficulties with hearing and speaking.[1]  (Compl., ECF No. 1). Pending before the court is United's motion for summary judgment.  (ECF No. 38).  For the reasons that follow, United's motion will be denied.[2]

---

[1]  The complaint also contained a claim for violation of the Pennsylvania Human Relations Act.  That claim, however, was dismissed on March 7, 2014 after Martsolf conceded that it was untimely.  (ECF Nos. 20, 27).

[2]  In accordance with 28 U.S.C. § 636, the parties have voluntarily consented to have the undersigned conduct any and all proceedings in this matter, including trial and entry of final judgment.  (ECF Nos. 13, 14).

## II.     Relevant Facts

### A.  Background

Unless otherwise indicated, the following facts are undisputed.

Martsolf worked for United at the Pittsburgh International Airport for approximately five months from October 31, 2011 until April 11, 2012.  She was interviewed for the position by United's general manager at the Pittsburgh station, Mel Johnson, and his administrative assistant, Joanne Triplett.   After the interview, Johnson made the decision to hire Martsolf for an administrative support position.  Triplett and Martsolf held similar positions, and they shared an office.  Johnson was Martsolf's immediate supervisor.

In addition to Johnson, Jeff Arnold and John Gallahan were supervisors at United's Pittsburgh station during Martsolf's employment.  Arnold was a supervisor of airport operations. Gallahan was supervisor over customer service.  United asserts that Arnold and Gallahan had minimal interaction with Martsolf, as she did not work directly for either of them.  However, Martsolf claims that because she worked in a non-supervisory clerical position, she was under the supervision of all of the supervisors at United, including Arnold and Gallahan.  In support, Martsolf points to her deposition in which she testified that Johnson, her immediate supervisor, specifically told her she was also to report to Arnold and Gallahan.  (Martsolf Dep., ECF No. 41-2 at 15).

At United, Martsolf's job responsibilities included payroll.   In this role she was responsible for accurately entering employee data relating to the number of regular and overtime hours worked into the company system known as the "MARS system."   Once this data was entered into the MARS system, the system would generate "paycerts," which showed the number of employee hours worked that were entered into the system for the applicable pay period.

Employee paychecks were based on the hours reflected on the paycerts. Martsolf was then responsible for printing the paycerts and placing them in the employee mailboxes. The purpose of this was to allow the employees to verify that the amount of pay logged in the system was accurate. If the amount was not accurate, the employees were to ask Martsolf to make any necessary corrections in the system.

Additionally, Martsolf was a deposit-preparer for United. In this role, she was responsible for counting money that was to be put into the safe, and preparing certain forms and deposit slips for company funds that were to be deposited into the bank. Martsolf received training from Darin Larson regarding her payroll responsibilities and Judy Murphy regarding the deposit-preparer responsibilities. Martsolf would occasionally call Larson and Murphy with questions regarding various aspects of these job functions.

B. Martsolf's Job Performance

The parties disagree as to whether Martsolf exhibited performance deficiencies in the above roles. United claims that during Martsolf's employment with the company, she failed on several occasions to put paycerts in employee mailboxes. In turn, this caused employees to complain to Johnson and Triplett about not receiving their paycerts. Additionally, on one occasion, United claims that Johnson had to personally print and place the paycerts in the employee mailboxes because Martsolf had failed to do so. Pointing to deposition testimony from Triplett, United further claims that on several occasions Martsolf had improperly entered the amount of hours that United employees worked into the MARS system, resulting in the paychecks containing the incorrect amount or being distributed to employees late.

Specifically, for the pay period ending February 11, 2012, United contends that more than thirty (30) employees were not paid the correct amount because Martsolf never placed the

paycerts in the employee mailboxes. Although there was an apparent malfunction with the MARS system on that particular occasion, United asserts that if Martsolf had delivered the paycerts into the mailboxes, the employees would have discovered the mistake and the problem would have been avoided altogether.

According to United, Martsolf also made errors in her role relating to completing forms associated with bank deposits. United claims that on March 14, 2012, Martsolf failed to complete an 202A deposit form. Additionally, on March 19, 2012, Martsolf used an incorrect deposit slip, which resulted in freight money being deposited into an account in the wrong bank.

Johnson issued Martsolf a letter of concern on March 20, 2012. This letter stated that Johnson and Martsolf met on March 5, 2012 regarding Martsolf's station responsibilities and stated that on March 14, 2012 Martsolf failed to complete the 202A deposit form. The letter also stated: "Make sure you provide all employees a copy of their paycerts on a weekly basis to avoid errors. Several weeks ago we had numerous pay issues and if the employees had a copy of their paycerts this would have been brought to our attention." (ECF No. 40-1 at 56).

On March 30, 2012, Johnson consulted with a representative of United's Human Resources ("H.R.") department, Ed Eget. Johnson sent Eget an e-mail stating in part that Martsolf "is not able to grasp what is required and is not able to finish her work on a consistent basis." (ECF No. 40-1 at 132). Johnson outlined several conversations that he had with Martsolf regarding her job responsibilities, including the alleged issues with paycerts. Additionally, Johnson stated that Martsolf had recently began calling him "sir" in a tone which he believed was clearly sarcastic. Johnson indicated that Martsolf continued to call him "sir" after he had asked her to stop. Ultimately, he suggested that Martsolf's employment with United be terminated. Also on that date, upon Johnson's request, Gallahan completed a memo evaluating

Martsolf's job performance based upon their interactions at work. (*Id.* at 189). Gallahan noted, *inter alia*, that Martsolf recently began referring to "all of us as 'sir,'" which he too felt was sarcastic. (*Id.* at 189).

Johnson obtained approval from Eget to terminate Martsolf. On April 11, 2012, Johnson met with Martsolf, handed her a termination letter, and notified her that her employment with United was terminated. (ECF No. 40-1 at 57). The termination letter stated the following:

> Delilah,
>
> You were hired as a Station Coordinator Airport Operations Support in Pittsburgh and were given collaterals within your role to support the stations. I have spoken with you on numerous occasions in relation to your job performance.
>
> I informed you to put employee's paycerts in their mailboxes on 11/28/11, 12/30/11 and 1/4/12. I verified this was not done on a consistent basis.
>
> On 3/20/2012, you were given a Letter of Concern for failing to complete a 202A form, during this meeting you were asked if you understood your responsibilities and you said, yes.
> On 3/19/2012 you prepared deposits for freight and used the wrong deposit slip therefore the money went to the wrong account.
>
> There have been numerous occasions when you have spoken to team members in an unprofessional manor [sic] which doesn't promote United Working Together Guidelines.
>
> Delilah, due to your poor job performance it is my decision to terminate your employment with United Airlines effective immediately
>
> Mel Johnson – GM Pittsburgh

(*Id.*). In his deposition, Johnson testified that it was his honest belief that Martsolf exhibited the above performance deficiencies. (Johnson Dep., ECF No. 40-1 at 129).

Martsolf disputes, however, that the above reasons offered by Johnson were in fact the real basis for her termination. Initially, Martsolf disputes that she ever failed to put paycerts in

employee mailboxes.  (Martsolf Dep., ECF No. 41-2 at 16, 19).[3]  Martsolf further asserts that she was wrongfully blamed for the incident regarding the A202A Form.  (ECF No. 41-6).  According to Martsolf, that form was not completed because Triplett failed to do so, and Martsolf advised Johnson of this.  (ECF No. 41-6).  Regarding the statement that Martsolf spoke to team members unprofessionally, she acknowledges that Johnson asked her to stop calling him "sir," but denies ever talking to any co-workers or supervisors unprofessionally.  (Martsolf Dep. at 18, 19). Martsolf does, however, admit that she improperly used the wrong deposit slip causing the money to be deposited into the wrong account.  Nonetheless, she contends that this error was minor because it was quickly discovered and corrected without any real issue.  Thus, Martsolf submits that the above purported performance deficiencies were not the real basis for her termination.  Rather, as discussed below, Martsolf maintains that she was fired because of discriminatory animus relating to her alleged disability as to hearing and speech.

### C.  Knowledge of Martsolf's Disability

United asserts that Johnson, Arnold, Gallahan, and Triplett did not know that Martsolf had a disability with respect to hearing and speaking.  Martsolf counters that during the job interview she specifically told Johnson and Triplett that she had trouble hearing, and asked them to look at her when they spoke so that she could read their lips.  (Martsolf Dep. at 9, 23, 30). She also submits that each of these individuals knew of her disability because they all personally harassed her and made comments about her difficulties with hearing and speaking, as discussed below.

---

[3]  Both parties have submitted Martsolf's deposition as an exhibit.  For purposes of consistency, the court will only reference Martsolf's exhibit, citing to the page numbers located in the ECF header, *hereinafter* as follows: (Martsolf Dep. at --).

D.  Hostile Work Environment Allegations

United has submitted declarations from Johnson, Arnold, Gallahan and Triplett in which they all deny engaging in derogatory treatment or harassing conduct based upon Martsolf's alleged hearing and speech disability.   However, Martsolf claims that these individuals "constantly" made references relating to her speech and hearing impairment.  (ECF No. 41-10 at 4).  Martsolf contends that they would "frequently" ask her to repeat herself, telling her that they did not understand her; but when Martsolf would ask them to repeat something, they would scream at her.  (ECF No. 41-12).  They also "constantly made fun of the way [she] would annunciate words" by mimicking her.  (*Id.*).  And the above supervisors apparently avoided Martsolf at work, as they "would never answer" their phones when Martsolf tried to reach one of them, but would answer if Triplett called them shortly thereafter.  (ECF No. 41-10 at 5).  Martsolf asserts that on several occasions, the treatment she received by these individuals made her visibly upset, causing her to get tears in her eyes.  She identifies the following specific conduct as to each of these individuals.

On "many occasions" when Martsolf would ask Johnson to repeat something, he would talk fast, scream at her, or talk very low.  (ECF No. 41-12 at 4).  She claims that Johnson "always" told her that she was stupid if she could not comprehend what he was saying.  (*Id.*).  Johnson would allegedly state "I gave you a simple task! Are you stupid and cannot perform a simple task? … Are you deaf, dumb or stupid? Never mind, you are just stupid."  (*Id.* at 3-4).  On one occasion, Martsolf requested help from Johnson, who replied that he did not have time and stated, "Figure it out yourself.  But never mind, you're too stupid."  (Martsolf Dep. at 24).  Moreover, if Martsolf had trouble hearing during meetings, Johnson would ask "can't you hear

what we are talking about?" and he allegedly told her that "this job is not for you." (ECF No. 41-10 at 4).

During a March 14, 2012 performance review meeting, Johnson "belittled" Martsolf, telling her that "not one" employee at United can understand a word that Martsolf speaks and that everyone at United, including Johnson, hates her. (*Id*.; ECF No. 41-12 at 3). When Martsolf responded that she was well-liked at work, Johnson allegedly stated that Martsolf is a "very blind and stupid person [if she] cannot see that [she] is hated here." (*Id.*). Additionally, regarding the incident involving the 202A Form, Johnson phoned Martsolf at home. (ECF No. 41-6 at 3). Martsolf claims that she tried to explain to Johnson that the reason the form was not completed was because of Triplett's failure to do so, but Johnson refused to listen and stated, "why waste your breathe [sic] I cannot understand a word you say." (*Id.*). Also, on several occasions, Johnson would stand behind Martsolf's desk, which Martsolf witnessed through the reflections on her computer screen, and would make faces behind her back and gestures of pointing a gun to his head. (Martsolf Dep. at 24-25).

Johnson's assistant, Triplett, is also accused of making derogatory comments about Martsolf for her hearing and speech impairments on a daily basis. (*Id.* at 22). On many occasions, if Martsolf was at the copy machine and did not hear her phone ringing, Triplett would "come flying through the door" and tell Martsolf that she was tired of hearing the phone ring and order Martsolf to answer it. (*Id.* at 23). Martsolf also testified that she connected a "flasher" to her work phone, which flashed when there was an incoming call so that Martsolf could see it when she was away from her desk. (*Id.* at 40). Multiple times when Martsolf was in the other room and saw her phone flashing and came through to answer it, Triplett made comments about the flasher by stating, "Woohoo there's a disco in here." (*Id.*).

Triplett would "always" ask Martsolf to repeat herself, stating "I can't understand a word you're saying" and tell Martsolf that she was "stupid" or a "dummy." (*Id.* at 24). Further, Triplett would allegedly mock Martsolf, imitating Martsolf by holding her nose when she talked and also by saying "What did you say? I didn't hear you. I got to read your lips. What did you say?" (*Id.*at 23); (ECF No. 41-12 at 2).

With regard to specific incidents, around March 19, 2012, Martsolf told Triplett that she would like to call the bank about the issue of the money being deposited into the wrong bank. (Martsolf Dep. at 24). Triplett responded, "Why? They're not going to understand a word that you say because I can't even understand a word that you say that comes out of your mouth." (*Id.*). On April 10, 2012,[4] Triplett made fun of Martsolf in front of the supervisors for Martsolf not being able to hear the noises that the broken copy machine was making. (ECF No. 41-12 at 3). Triplett allegedly stated, "Delilah claims she cannot hear that noise. How can she not hear it when it is so loud?"; this comment resulted in laughter from everyone present. (*Id.*). On a different occasion, Triplett questioned Martsolf as to how Martsolf ever expects to get a teaching degree "when [she] can't even talk right?" (Martsolf Dep. at 24). Triplett stated that Martsolf will "never get hired at a teaching school because kids don't understand you because adults can't even understand what you're saying." (*Id.*). Triplett also allegedly participated with Johnson in making faces and gestures at Martsolf behind her desk, which Martsolf observed through her computer screen. (ECF No. 41-12 at 2, 5).

Regarding Arnold, Martsolf testified that he "always made fun of me," including making faces at her and calling her stupid. (Martsolf Dep. at 21-22). She identified an incident from February 23, 2012 in which Arnold screamed at her in front of a few ticket agents. After Martsolf requested that Arnold lower his voice and talk to her with respect, Arnold allegedly

---

[4]     This was the day before Martsolf received her termination letter from Johnson.

stated that he will never give Martsolf respect and told Martsolf that he will talk to her however he wants. (*Id.*); *see also* (ECF No. 41-10 at 4). Arnold allegedly told her to "[o]pen your mouth when you talk" and stated that nobody can understand any words that she speaks. (*Id.*). Arnold proceeded to mock Martsolf, repeating and imitating the way that she spoke. (*Id.*).

Turning to Gallahan, he acknowledged that Martsolf's voice was "maybe a little different," agreeing with Martsolf's counsel that "sort of nasally" was a fair description. (Gallahan Dep., ECF No. 40-1 at 170-1). Martsolf asserts that on "several" occasions, he said variations of the following: "open [your] mouth when you speak because it's just like air coming out of it," and "What did you say? I can't understand what you're saying? Say it again." (Martsolf Dep. at 22).

### E.  Reporting of the Alleged Harassing Conduct

Martsolf claims that she had told Johnson that she was going to report him to H.R, but he allegedly responded by daring her to do so, stating, "Call H.R. I own H.R. I own H.R. Call them." (*Id.* at 22). Thereafter, she never actually reported Johnson to the H.R. department. Martsolf also testified that she had multiple conversations with a United supervisor, Donald Beckley, about how she was treated. (*Id.* at 11). According to Martsolf, Beckley initiated the conversations when he observed her with tears in her eyes. (*Id.* at 12). However, Beckley issued a declaration denying ever speaking with Martsolf about any harassing behavior from United employees. (ECF No. 40-1 at 235 ¶ 5). Martsolf finally claims to have spoken with various other co-workers at United about the alleged harassment, as well as Larson, the training supervisor, via telephone. (Martsolf Dep. at 12-14).

Under United's "Working Together Guidelines," there are sections pertaining to the following: dignity and respect; honesty; professionalism; equal employment opportunity policy;

harassment and discrimination; and reporting offensive workplace behavior. The guidelines specifically state that United is "committed to providing a work environment free from offensive behavior or discrimination (treating someone less favorably) based upon a person's … disability … (or any other protected category under applicable law)." It further identifies that some "examples of offensive behavior that violate this policy include inappropriate jokes, teasing, epithets, or slurs. … inappropriate comments." Under the policy, "[a]ny offensive behavior or discrimination (verbal, visual or physical) directed toward a person because of any protected characteristic" is a violation and the offending party is subject to corrective action, including discipline or termination of employment.

The guidelines establish reporting procedures and various outlets for workers experiencing discrimination, as follows:

> You may want to politely but firmly confront the person who is engaging in the offensive behavior. State how you feel about his or her actions. Politely request that the person stop the unwelcome or improper behavior because you feel offended, uncomfortable or intimidated. If practical, bring a co-worker with you to this discussion.

> If you are uncomfortable or if you do not wish to speak directly to the individual, or if the offensive behavior continues after you confront the person, report the offensive behavior to any member of management.

> If your problem was not resolved after you spoke to a supervisor or manager, or if your complaint involves your supervisor or manager, you must report your complaint to the next level of-supervision or contact the Employee Service Center at 877-825-3729.

> At any time you must report your concerns directly to your Human Resources Partner or the Employee Service Center at 877-825-3729.

> If you fear retaliation or believe you have experienced retaliation for reporting a complaint of discrimination or harassment or participating in an investigation, contact the Employee Service Center at 877-825-3729 or your Human Resources partner.

Co-workers can report offensive behavior anonymously by calling the United hotline at 888-700-4244, email Business-Conduct-Office@united. com (for subsidiary United co-workers) or the Ethics and Compliance Helpline at 866-428-1497, email ethics@coair.com (for subsidiary Continental co-workers). Keep in mind, however, that we can only investigate anonymous reports if the caller gives enough information to identify the problem, the location, and the individual(s) about whom the complaint is made.

(ECF No 41-1 at 52).

When Martsolf began working at United, she received and read the above guidelines. She admits that she did not report any of the alleged conduct of Johnson, Arnold, Gallahan or Triplett to the Employee Service Center, the H.R. department, the Business Conduct Office, United's hotline, or the Ethics and Compliance Helpline. (Martsolf Dep. at 11-12).

F. Emails Delivered after Termination

Sometime after Martsolf's employment with United concluded, she claims to have received an envelope in the mail. The envelope contained three documents that appear to be printouts of e-mails that were purportedly created by Triplett, although United has submitted a declaration from Triplett in which she denies writing or sending them. These documents have various portions blacked out relating to the recipient, date, and subject line. (ECF No. 41-13 at 7-9). These purported e-mails make derogatory comments about Johnson and Arnold, questioning their competence and professionalism as supervisors, and criticize Martsolf for documenting incidents at work, being stupid, and having difficulties speaking. (*Id.*). Martsolf testified that she does not know who delivered these documents to her. (Martsolf Dep. at 35).

A separate envelope containing two of the three purported e-mails was handed to a United employee working at the ticket counter by a worker from a different carrier, JetBlue.[5] The United employee then placed this envelope in a general correspondence mail tray. Gallahan

---

[5] United claims that the JetBlue employee was asked by Arnold how she received the envelope. She allegedly stated that an elderly gentleman came to her ticket counter and handed it to her. In response, Martsolf asserts that this conversation constitutes inadmissible hearsay.

subsequently found the envelope lying on the floor of the supervisor's office. Triplett was present when Gallahan opened and read the purported e-mails, but denied sending them. Gallahan then investigated whether Triplett sent the e-mails and concluded that she did not create or send them, but he acknowledged in his deposition that he has no specialized knowledge as to recovering deleted e-mails or verifying their authenticity. (ECF No. 41-15).

Martsolf asserts that the e-mails appear to be legitimate, as they match the same format as other e-mails from United employees. And although Beckley declared that he believed the e-mails were fake and that he never said anything to Martsolf to the contrary, (ECF No. 40-1 at 236 ¶¶ 7-9), Martsolf testified that Beckley specifically told her that the e-mails were real. (Martsolf Dep. at 39).[6]

### G. Completion of Education Post-Termination

While Martsolf was working at United, in the spring of 2011, she began seeking a master's degree by studying special education at Robert Morris University. (Martsolf Dep. at 4). After she was terminated from United, she did not seek another job, but continued completing her education. (*Id.* at 4, 31). She testified that she was set to graduate in December of 2014 and planned to pursue a career as a special education teacher thereafter.[7] (*Id.* at 4). She does not wish to return to work at United. (*Id.* at 31).

---

[6] Martsolf also notes that one of the e-mails misspells the word "manner" as "manor." The termination letter from April 11, 2012 contains the same misspelling. Martsolf claims that Triplett routinely typed such letters for Johnson during Martsolf's employment at United and asserts that this spelling error suggests that Triplett drafted the purported e-mails. However, Johnson and Triplett deny that Triplett drafted the termination letter.

[7] Though not part of the record, in her brief, Martsolf states that she has completed the program and is actively searching for a job in this field.

### III. Summary Judgment

Rule 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When applying this standard, the court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).

The non-moving party cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument, but must "put up or shut up." *Berckeley Inv. Group., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (quoting *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985)). Plaintiff must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The inquiry, then, involves determining "'whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218 (1991) (quoting *Anderson*, 477 U.S. at 251-52). "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)).

A party claiming that a fact cannot be or is genuinely disputed must support that assertion either by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c)(1).

A "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2). An "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4).

It is the obligation of the parties to pinpoint specific portions of the record which they argue support their characterizations of the material undisputed facts and their positions. Rule 56(e) provides:

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

    (1)  give an opportunity to properly support or address the fact;

    (2)  consider the fact undisputed for purposes of the motion;

    (3)  grant summary judgment if the motion and supporting materials-- including the facts considered undisputed--show that the movant is entitled to it; or

    (4)  issue any other appropriate order.

Similarly but somewhat more pointedly, under our local rules, a motion for summary judgment must be accompanied by "separately filed concise statement setting forth the facts essential for the Court to decide the motion for summary judgment, which the moving party contends are undisputed and material . . . . A party must cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact". LCvR 56.B.1. The same is required of a plaintiff's responsive statement of material facts. LCvR 56.C.1. *See Bowman v. Mazur,* 2010 WL 2606291, *3 (W.D.Pa. 2010) ("Plaintiff's responsive statement of material facts is insufficient to create a genuine issue of material fact because it failed to comply with Local Rule 56.1.C.1 . . . by failing to cite to specific portions of the record in support of his responsive concise statement of facts." Court therefore ignored Plaintiff's denials in his responsive statement of material facts and deemed "admitted those very facts that he sought to deny.").

"It is not for the court to search through the record . . . to find support for the plaintiff's purported facts; that burden lies with the plaintiff in responding to the defendant's materials." *Murray v. JELD-WEN, Inc.*, 922 F.Supp.2d 497, 503 (M.D.Pa. 2013). More colorfully, it has often been stated that "judges are not like pigs, hunting for truffles buried in briefs" and that, if

factual support for a party's claims or defenses exist in the record, it is incumbent on the party to direct the District Court's attention to those facts. *DeShields v. Int'l Resort Prop. Ltd.*, 463 Fed.App'x 117, 120 (3d Cir. 2012) (quoting *United States v. Starnes*, 583 F.3d 196, 216 (3d Cir. 2009) and *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex*, 477 U.S. at 322; *UPMC Health Sys. v. Metropolitan Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. *Williams v. Bor. of West Chester*, 891 F.2d 458, 460–461 (3d Cir. 1989) (non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment).

## IV. Discussion

### A. Knowledge

United initially asserts that it is entitled to summary judgment as to both the termination and harassment claim because Johnson, Arnold, Gallahan, and Triplett were all unaware that Martsolf had an ADA-covered disability, and thus there could not be any discrimination or harassment "because of" her alleged disability. United argues that at best, these individuals only had "knowledge of *symptoms* that could possibly be related to a speech or hearing disability." (Def.'s Br. in Supp. at 39, ECF No. 9). In this case, however, Martsolf's symptoms (trouble hearing and speaking) are indistinguishable from her alleged ADA-covered disability (hearing loss that affects her ability to speak).[8]

---

[8] United cites to *Dorn v. Potter*, 191 F.Supp.2d 162 (W.D. Pa. 2002) in support of its argument. However, *Dorn* followed the analysis provided by *Toyota Motor Manufacturing., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) and *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999). Congress subsequently enacted the ADA Amendments Act of 2008, Pub. L. No. 110-325, Sept. 25, 2008, 122 Stat.

Martsolf testified that she informed Johnson, the terminating supervisor, and Triplett during the interview that she had trouble hearing and needed to read their lips. She further testified that, on a frequent or constant basis, Johnson, Arnold, Gallahan, and Triplett collectively and individually screamed at her, mocked her and imitated the way she spoke, complained about being unable to understand her, and laughed at her *because of* her hearing and speech difficulties. Therefore, when viewing all of the record evidence in a light most favorable to Martsolf, a reasonable jury could conclude that these individuals had knowledge that Martsolf had an ADA-covered disability or regarded her as having the same, and engaged in said conduct because of her alleged disability. Consequently, these genuine issues of material fact must be resolved by the trier of fact. *See Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 763 (3d Cir. 2004) ("The question of whether an individual is substantially limited in a major life activity is a question of fact."); *see also* 42 U.S.C. § 12102(2)(A) (hearing and speaking constitute major life activities).[9]

B. Termination Claim

The parties agree that this claim is covered by the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). "Under the first step in the *McDonnell Douglas* analysis, the plaintiff bears the burden of making out a prima facie case of

---

3553 (2008), which took effect January 1, 2009. The purpose of the Act was "to broaden the category of individuals entitled to statutory protection from disability discrimination." *Venter v. Potter,* 694 F.Supp.2d 412, 425 (W.D. Pa. 2010). Notably, the Act "displaced the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing* and *Sutton*" specifically as to whether a plaintiff's impairment "substantially limits" a major life activity. *Id.*

[9]  The court notes that Martsolf has offered medical records substantiating her claim that she has a disability as to hearing loss that affects her ability to speak. Specifically, she has adduced an audiogram showing her hearing loss and a medical report indicating that her "voice and speech are consistent with hearing loss." (ECF Nos. 41-8, 41-9). *Cf. Marinelli v. City of Erie*, 216 F.3d 354, 361 (3d Cir. 2000) (failure to produce any medical evidence of an impairment that would be obvious to a lay jury does not, in and of itself, warrant judgment as a matter of law in favor of the employer; it is instead a factor that weighs in favor of the employer).

discrimination." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013); *see also Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir.2000) (applying the McDonnell Douglas framework to ADA claims). "In order to make out a prima facie case of disability discrimination under the ADA, [the plaintiff] must establish that she (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006). The "evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case." *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001) (alteration in original) (internal quotation marks omitted). If a plaintiff fails to raise a genuine dispute of material fact as to any of the elements of the prima facie case, she has not met her initial burden, and summary judgment is properly granted for the defendant. *See Geraci v. Moody–Tottrup, Int'l, Inc.,* 82 F.3d 578, 580 (3d Cir. 1996).

Once the plaintiff makes out her *prima facie* case, "the burden of production [then] shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Smith,* 589 F.3d at 690; *see also Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 644 n. 5 (3d Cir. 1998). This burden is "relatively light" and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason. *Tomasso v. Boeing Co.,* 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994)); *see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 302 (3d Cir. 2012) (describing this "minimal burden"). At this stage, "the defendant need not prove that the articulated reason actually motivated its conduct." *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 189 (3d Cir. 2003) (internal quotation marks omitted).

After the employer offers a plausible justification, the *McDonnell Douglas* analysis shifts the burden of production back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination. *Fuentes,* 32 F.3d at 764–65; *see also Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 799–800 (3d Cir. 2003); *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 364 (3d Cir. 2008). To make a showing of pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764.

The plaintiff's evidence as it relates to the employer's proffered justification, "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes,* 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 531 (3d Cir. 1992)). Plaintiff need not present additional evidence of discrimination beyond her *prima facie* case to survive summary judgment, because the factfinder may infer, from the combination of the *prima facie* case and its rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason. *See Fuentes,* 32 F.3d at 764; *Fasold v. Justice,* 409 F.3d 178, 185 (3d Cir. 2005); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

Pointing to Martsolf's alleged performance deficiencies, United asserts that Martsolf has failed to meet her burden in establishing both a *prima facie* case, arguing that she was not qualified to perform the essential functions of the job, and that United's legitimate, non-discriminatory reasons for her termination were a pretext for discrimination. However, as discussed in detail above, Martsolf emphatically denies that the reasons offered by Johnson in the termination letter were accurate and questions Johnson's declaration that it was his honest belief that Martsolf had all of the stated performance deficiencies. Martsolf denies that she ever failed to put paycerts in employee mailboxes, denies that she was the reason that the 202A form was not completed, and denies ever speaking unprofessionally to any co-workers. She further contends that Johnson knew that all of these reasons were false. Martsolf does, however, acknowledge that she committed an error resulting in money being deposited into the wrong bank, but she claims that the error was quickly discovered and corrected and that "nothing came of the incident." (Pl.'s Br. at 4). Moreover, Martsolf has offered evidence that Johnson frequently berated Martsolf for her difficulty hearing and speaking, including screaming at her, calling her stupid, and telling her that "this job is not for you" if she had trouble hearing.

As a result, while United has offered evidence to support its position that its justification for terminating Martsolf was non-discriminatory, if the jury were to find Martsolf's version of the events to be credible, the jury could rationally conclude that Martsolf was qualified to perform the essential functions of the job and "infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."[10] *See Fuentes*, 32 F.3d

---

[10] This is true even in light of the fact that Martsolf has failed to sufficiently deny, in accordance with Local Rule 56, Triplett's declaration that on several occasions United employees were paid the wrong amount due to Martsolf's inaccurate entry of data into the MARS system. Without pointing to any contradictory evidence, Martsolf baldy asserted that she always accurately entered data into the system and stated that there is no evidence to substantiate this claim. Therefore, for purposes of this motion, this fact must be deemed to be admitted. However, given that it was not stated as a reason in the termination

at 762. Therefore, when considering all reasonable inferences in favor of Martsolf, genuine issues of material fact prevent summary judgment as to her termination claim.

### C. Hostile Work Environment Claim

In *Walton v. Mental Health Associates of Southeastern Pennsylvania,* 168 F.3d 661 (3d Cir. 1999), the court assumed, without deciding, that the ADA creates a cause of action for a harassment/hostile work environment claim. Therefore, a plaintiff asserting harassment based on disability must establish the following elements: (1) she is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) the employer knew or should have known of the harassment and failed to take prompt effective remedial action. 168 F.3d at 667.

In assessing said elements, courts evaluate the record "as a whole," concentrating "not on individual incidents, but on the overall scenario." *Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001). Relevant factors for the court to consider include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993). In this case, there are factual disputes regarding all of these factors.

As we already rejected United's argument that there is no evidence suggesting that Johnson, Arnold, Gallahan, or Triplett knew of Martsolf's alleged disability, we will turn to United's next argument that the alleged conduct was not severe or pervasive. Although United

---

letter, the court finds that when making all appropriate inferences, the jury could still conclude that Martsolf was fired as a result of discriminatory animus notwithstanding the inadvertent admission of this fact.

offers declarations from these individuals maintaining that they never made any inappropriate or offensive statements or gestures to Martsolf about her alleged disability and that they did not discriminate or harass her based upon her disability, the evidence submitted by Martsolf tells a different story. As outlined in detail above, Martsolf testified that these individuals constantly screamed at her when she could not hear them, complained when they could not understand her, and mocked and imitated the way that she spoke. Notably, there is evidence showing that this alleged conduct resulted in Martsolf crying or developing tears in her eyes to the point that other United workers would console her. However, United claims that much of this alleged conduct, such as calling her stupid or a dummy and making faces and gestures of a gun to the head, is disability neutral. But when considering the surrounding circumstances as whole, a reasonable jury could conclude that all of this behavior was done as a result of their discontent with Martsolf's ability to hear and speak. To be sure, Martsolf testified, for example, that Johnson would call her stupid in response to her asking him to repeat something.

Moreover, Martsolf notes that at the summary judgment stage, the court is unable to fully assess the "demeanor evidence" or the tone of the individuals in this lawsuit. Indeed, on their face, some of the alleged comments, such as "What did you say? I can't understand what you're saying? Say it again," are not necessarily offensive or discriminatory; but depending on the context and tone of the speaker, a jury could find them to be. Of course, Martsolf has provided other comments that unquestionably could be viewed as discriminatory, such as Johnson telling her that "not one" employee can understand a word she states and that she is a very stupid person if she cannot see she is hated at United, or Johnson telling her that "this job is not for you" when she had trouble hearing in a meeting. Therefore, when looking at the totality of the circumstances and viewing all of the facts in a light most favorable to Martsolf, United has failed

to demonstrate that there are no genuine issues of material fact as to whether the alleged conduct of Johnson, Arnold, Gallahan, and Triplett was severe or pervasive.

United next argues that it is nonetheless entitled to the affirmative defense outlined in the Supreme Court cases *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), commonly referred to as the *Ellerth/Faragher* affirmative defense.  Under this defense, an employer may escape liability for the harassing conduct of a supervisor if the employer (a) exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth*, 524 U.S. at 765.  Based upon Martsolf's failure to follow United's reporting procedures prescribed in its company policies (the guidelines),[11] United contends that Martsolf's hostile work environment claim fails.  However, this defense is unavailable if the "supervisor's harassment culminates in a tangle employment action, such as discharge, demotion, or undesirable reassignment."  *Faragher*, 524 U.S. at 808 (citing *Ellerth*, 524 U.S. at 762-3); *see also Vance v. Ball State Univ.*, --- U.S. ---, ---, 133 S. Ct. 2434, 2439 (2013) ("If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.").[12]

Martsolf argues that under *Ellerth/Faragher*, United is strictly liable for the alleged harassing conduct of its supervisors.  In its reply brief, United counters that this affirmative

---

[11] Martsolf does not dispute that she failed to follow United's reporting procedures.  She instead argues that failing to do so was not unreasonable, as she claims to have reported this behavior to various supervisors and because Johnson dared her to call H.R., stating that he "owned H.R."  Because United had in place several reasonable alternative avenues for employees to report supervisor harassment, of which Martsolf was aware but apparently chose not to follow, her failure to comply with these procedures was unreasonable based upon the record evidence.

[12] In *Vance*, the Supreme Court held that for purposes of vicarious liability under Title VII, an employee is a "supervisor" if he or she is empowered to take tangible employment actions against the victim.  133 S. Ct. 2434.

defense is available because "there is no evidence [here] that any alleged harassment was related to her termination." (Def.'s Reply Br. at 4 n. 7). United asserts that "[i]t is undisputed that Johnson, Martsolf's supervisor, made the termination decision based on Martsolf's undisputed performance deficiencies, and did not consult with Triplett, Arnold, or [Gallahan] in making his decision." (*Id.* at 4-5 n. 7). The court disagrees.

As already discussed, Martsolf has sufficiently disputed whether she in fact exhibited the alleged performance deficiencies. Given that these individuals, including the terminating supervisor, are alleged to have collectively engaged in harassing conduct, there is a genuine issue of material fact as to whether Martsolf was fired as a result of the alleged hostile work environment. Thus, the *Ellerth/Faragher* affirmative defense is unavailable to United at this time. With regard to liability for co-worker harassment, which is governed by a negligence standard, *see Vance*, 133 S. Ct. at 2439, the court likewise finds that there is a genuine dispute of fact as to whether United "knew or should have known of the harassment and failed to take prompt remedial action," *see Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir. 1990), in light of the alleged collective harassing conduct of Martsolf's supervisor(s) and co-worker(s).[13]

### D. Mitigation of Damages – Back Pay and Front Pay

United alternatively argues that if the termination claim proceeds, it is entitled to summary judgment as to Martsolf's claims for back pay and front pay, asserting that Martsolf has failed to mitigate her damages after she was discharged. Back pay and front pay are equitable remedies to be determined by the court, although a jury may issue an advisory opinion

---

[13] It is undisputed that Johnson was a supervisor in accordance with *Vance,* given that he hired and fired Martsolf, and it is undisputed that Triplett was a co-worker. As to Gallahan and Arnold, it is unclear based upon the record evidence whether they were empowered to take tangible employment action against Martsolf. However, for purposes of resolving the present motion, this discrepancy is not dispositive, although the parties will need to confront this issue in the future.

as to these damages. *See Donlin v. Philips Lighting N. Amer. Corp.*, 581 F.3d 73, 78 n. 1 (3d Cir. 2009). The purpose of a back pay award is to "make persons whole for injuries suffered through past discrimination" until the time of trial. *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 864 (3d Cir. 1995); *see also Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006) (a hostile work environment claim combined with an actual or constructive discharge may lead to an award of back pay). "Front pay is an alternative to the traditional equitable remedy of reinstatement, *Squires v. Bonser*, 54 F.3d 168, 176 (3d Cir. 1995), which would be inappropriate where there is a likelihood of continuing disharmony between the parties or unavailable because no comparable position exists." *Donlin*, 581 F.3d at 86.

While there is generally a presumption in favor of a back pay award if an employer is found to have unlawfully terminated an employee, the aggrieved employee has a statutory duty to mitigate her damages. *Booker*, 64 F.3d at 864. The burden of establishing that the employee failed to mitigate her damages rests with the employer; to satisfy said burden, it must be shown that (1) substantially equivalent work was available, and (2) the employee failed to exercise reasonable diligence to obtain the employment. *Id.* An aggrieved employee exercises reasonable diligence "by demonstrating continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment." *Id.*

Here, based upon the record evidence before the court, Martsolf has not exercised reasonable diligence to obtain employment. She did not apply for any other jobs and does not seek reinstatement with United. Nor does she offer any evidence to support her contention that applying to other comparable jobs in the same industry would have been futile. Instead, she asserts that pursuing a master's degree in special education was her only way to mitigate her damages. However, the court notes that she testified that she began this program *while* she was

still employed at United.  Therefore, as she was already enrolled in the program at the time of termination, her contention that merely finishing the program could be considered mitigation of damages is highly suspect.  Furthermore, her reliance upon *Marinelli v. City of Erie*, 25 F.Supp.2d 674, 678-9 (W.D. Pa. 1998), *vacated and remanded by,* 216 F.3d 354 (3d Cir. 2000), is misplaced.  In that case, the court's back pay analysis was premised on the finding that the plaintiff, who was injured at work, was physically unable to return to work in a similar position due to his alleged disability.[14]  Therefore, the court reasoned that, *under the circumstances*, pursuit of education in a non-comparable field could not be considered a failure to mitigate.  In contrast, Martsolf does not contend that she is physically incapable or that her alleged disability otherwise prevents her from being able to work in a similar position to the one that she held at United.  Rather, she merely speculates that the chances of getting hired at a different airline were "nil," so she did not even try.  As such, United has established, for purposes of this motion, that Martsolf failed to exercise reasonable diligence to obtain employment

Nevertheless, we reject United's argument that Martsolf's complete failure to search for other jobs creates an exception to the requirement that it carry its burden in establishing that substantially equivalent work was available.  While other circuits have reached the conclusion that an employer is absolved from proving the availability of substantially similar jobs when the aggrieved employee made no efforts to seek such employment, *see, e.g., Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 54 (2d Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991); *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990); *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999), in this circuit the burden remains upon the

---

[14]  On appeal, the circuit reversed, finding that the plaintiff was not disabled because he failed to produce sufficient evidence to establish that his impairments constituted a substantial limitation on a major life activity or his ability to work.

employer.  In *Booker*, the court analyzed whether the employer met its burden in establishing

that substantially similar employment was available notwithstanding that the evidence showed

that the plaintiff did "not appear to demonstrate his continuing commitment to be a member of

the work force."  64 F.3d at 865-6.[15]  Moreover, *Booker* rejected a "no mitigation-no backpay"

rule, finding that depending upon the circumstances, a back pay award may be appropriate to

make the employee whole even if she otherwise failed to mitigate.  *Id.* at 856-7.  Consequently, a

plaintiff's failure to mitigate does not necessarily foreclose a back pay award; rather, a court may

"reduce or decrease" the award.  *Id.* at 866.

As United offers no evidence that substantially equivalent work was available to

Martsolf, it has failed to carry said burden at this time in establishing that she failed to mitigate

her damages.  Therefore, United is not entitled to summary judgment as to Martsolf's requested

relief of back pay or front pay at this time.  However, any such awards from the jury would be

heavily scrutinized by the court and adjusted accordingly if it is established that Martsolf failed

to mitigate her damages.

## V.     Conclusion

In accordance with the foregoing, United's motion for summary judgment is denied, as

genuine issues of material fact exist which must be resolved by the jury.  An appropriate Order

follows.


Dated: <u>July 14, 2015</u>

---

[15]   *See also Le v. Univ. of Pennsylvania*, 321 F.3d 403, 407 (reiterating that employer has burden of
establishing both elements when asserting failure to mitigate damages); *Donlin,* 581 F.3d at 89 ("Pursuant
to our holding in *Le,* [the defendant] was required, as the discriminating party, to demonstrate that
substantially equivalent work was available, and that [the plaintiff] did not exercise reasonable diligence
to obtain such employment.").

By the Court:

s/ Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

cc:     All counsel of record via CM-ECF

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DELILAH MARTSOLF,                    )
                                     )
        Plaintiff,                   )        Civil Action No. 13-1581
                                     )
        v.                           )
                                     )        United States Magistrate Judge
UNITED AIRLINES, INC.,               )        Cynthia Reed Eddy
                                     )
        Defendant.                   )
                                     )

**ORDER**

AND NOW, this 14th day of July, 2015, upon consideration of the parties' filings and in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED that Defendant United Airlines, Inc.'s Motion for Summary Judgment (ECF No. 38) is DENIED.

It is further ORDERED that the court will hold a telephone status conference on July 29, 2015 at 10:00 AM.  Plaintiff is to initiate the call to chambers once all parties are on the line or otherwise provide the court and United with an appropriate dial-in number.  The parties shall submit updated confidential position letters by faxing chambers at 412-208-7583 no later than 12:00 PM on July 27, 2015, which shall specifically identify their respective settlement posture.


                                        By the Court:

                                        s/ Cynthia Reed Eddy
                                        Cynthia Reed Eddy
                                        United States Magistrate Judge


cc:     All counsel of record via CM-ECF